May it please the court, counsel, my co-counsel in this case, Darius Bursch, Joe Leal, have come to you to ask you to reverse the summary judgment which was entered by the district court in this case, finding that there were no violations of the Fourth Amendment based upon facts, no material disputes of facts according to that judge. And yet the facts of this case are simple. The defendant who had turned his back on 12 police officers and raised his hands was shot from behind by the defendant in this case. At the time of the shooting he had nothing in his hands. He was 30 feet, or the distance between your honors and these tables. At the time, shortly before, the only thing he could possibly have had in his hand was rosary beads. Look at the pens that sit on the tables of these lawyers. You can see them, and in the bright Arizona sun he could see that the man that he was shooting was not armed. He also had been participating in 70 minutes of a chase where he had driven throughout the town in a course that led him time and time again past a certain house. And during those 70 minutes he had not fired a gun once. He had not been seen to have a gun. He had on one occasion held a wallet and tried to pretend he had a gun. He said to a number of people that he had a gun. But during the 70 minutes there's no evidence that he ever used it. When he drove, he drove with one hand out the window. Oftentimes he didn't shoot anyone. At times when he was surrounded by police cars he drove in an intricate manner that avoided all the police cars and he just kept driving. And he said, you're going to have to shoot me or I'm just going to keep driving. And at the very end, after the car had been disabled so that his driving was no longer a factor, he got out of the non-lethal. Defendant Rankin says he didn't hear that. Defendant Rankin... Counsel, can you address the argument that the county puts forward that Mr. Longoria assumed what they call a shooter stance in the direction of Deputy Rankin and the effect that that would have on his perception of a threat and his split-second decision to use lethal force under those circumstances? Well, if Exhibit 15 to the defendants is an you can see the second by second what's occurring. There's a time period starting where Rankin gets into position and at that point Mr. Longoria has one of his hands behind his back. Some people might say that he's holding up his pants. Other people might say he could be hiding a gun. Other people might say that he wants to die and so he's hiding that hand for that purpose. But again, you have a factual dispute. But then he begins to get shot. I'm sorry, what's the factual dispute? Well, the factual dispute is the inference that you derive from that fact. Does having his hand behind his back mean that he has a gun? What does it matter what's going on in his head? What matters is what a reasonable officer might perceive from that. But is there only one interpretation? Sorry, the reasonable officer perceives he's hiding his hand. Correct. So you say there's a dispute as to what's going on in his head. Why does it matter what's going on in his head, in the suspect's head? The objective fact is that he has his hand behind his back. That's what matters. There's no factual dispute. The inference that you can draw from that is what I'm saying can be different. I understand you're saying that. I'm just saying why does that inference matter? Why does the inference of what's going on in the suspect's head, whether he was doing it to hold up his pants or whether he was doing it to hide a weapon or he was doing it to... Why does that thought process make any difference? Because it's not like in cartoon land where there are balloons over their head telling the officer what's going on in the suspect's head. What the officer sees is he says, show your hands, and he doesn't show his hands. He shows one hand and he's got a hand behind his back. Correct, Your Honor. But at 13... Well, I ask you a question. Why does it matter? Because we're not dealing with just, we're dealing with 70 minutes that this is the final, the end of that 70 minutes, but at 1 o'clock or 1 hour... I'm sorry, I don't think we're communicating here. You offered three options of what he might have been thinking, the reasons he might have had behind his head. And I'm asking you, what difference does it make which of the three things are true? What's going on in the suspect's head? Why does it matter why he subjectively was holding his hand behind his back? Because... Make the last effort to give a justification and then let's get to something else. Because within the context of what had happened earlier, it was obvious that previously he had put his hand behind his back with a wallet there in order to get shot. So within the context, if Rankin had heard he's got a wallet on the previous occasion, then he should be given a context to what he's seeing right now. Because he drives around for 70 minutes, again, if he wants to be shot, all he has to do is pull a gun out, point it at an officer, and he's going to be shot. The fact that he has his hand behind... Let me just stop you. You haven't answered my question about the shooter stance. So the question is, on the video you can see, and I know you said it was enhanced, but you can see a moment when it does appear that one could reasonably interpret his pose to be a shooter stance. Why isn't that enough to create a reasonable fear of the officer of possibly being shot and therefore the need to use lethal force? Thank you, Your Honor. Great question. But when he starts getting shot and his hand comes from behind his back and basically his arms are flailing because he's being hit by four separate beanbag shots, they can see that he doesn't have a gun. The rosary beads come flying out of his hand. And at some point, again, if you take a camera and take a picture of one of those things in front of a car dealership that's arms flail around, eventually you're going to see something that is going to look like a shooter stance if you just parse it apart. It's a tenth of a second when he brings his hands up like this, and again it's from 200 feet away down the road, you don't get any depth perception. You see that he puts his hands in front of him and then he turns his back to the police and puts his hands up. And so he has seconds to be able to look at the fact that there is no gun in his hand. The only thing that could be considered to look like a gun is the rosary beads, which come flying out. And at the time that he goes like this, he is 30 feet away and can see that he doesn't have a gun. And then he turns and puts his hands up. And unless this court is willing to make a finding that, as a matter of fact, if at .9 seconds you begin to put your arms down, and at zero seconds when they shoot that you've got your hands up, that that is an excusable event because psychologically or physiologically that people can't change their mind or stop themselves from shooting, that would be a finding of fact that's not been in this record. So you're saying it's a factual question even as to whether or not a shooter stance occurred? Is that right? Because you can't see within the context of what's occurring whether or not his hands are like this or whether his hands are somewhere apart but 200 feet away from behind from the iPhone that's bouncing up and down, whether it's actually a shooter stance. You can see his arms are in an area that could be that, but his head's down. He's just hit by a bean bag. And when he's shot, his hands are raised and he presents no danger to any of the officers, including the officer who shot. And it's somewhat relevant that there are 13 officers and there is one person using deadly force. Everyone sees the same thing. If we have 12 jurors, we have 12 people that didn't shoot when they saw everything that the officers saw. So we believe that those are significant. Isn't there some evidence that the other officers kind of ducked or flinched when he was assuming that, what the county is calling the shooter stance? You can see two or three officers react, but as to what they're reacting, are they reacting to the bean bags bouncing off of them? You can see those at different times. He turns to them and looks at them, or he's in that general direction. Are they reacting to that? A jury can take a look at that. We can certainly lose this case, but we should be able to win a jury trial, you mean? Yes. A jury can look at that and they can come up with their own conclusions as to whether or not we should win. I'm saying merely that the people that were there, flinching is one thing, firing a gun is another. There are a number of facts which are inferential. The fact that if we have a person who is facing police officers, and there's 12 of them over here, if Officer Rank believes that this man has a gun and is going to start shooting and that these 12 people all have guns and are going to be shooting back, the jury can infer from the fact that he runs behind him to get over to a position where he can shoot and be one of the shooters, they might assume that maybe he isn't so worried about this that he used a wallet in the past. He's been there listening to the 70 minutes of this unfold, and we believe that we should have that opportunity because it is a factual issue. It's an intricate factual issue that's based on a totality of the circumstances in a rapidly evolving situation, but one that continually shows the officers who are paying attention. He was the person that was supposed to be listening to the radio when they announced that there was a wallet and not a gun. He was the person who's there when they're yelling less lethal, less lethal, and then they start firing beanbags at him. Well, you're not saying that the record shows that he heard the less lethal, are you? We're saying that a jury could find that he did, but we were precluded from doing any discovery on the other witnesses because the judge said, oh, there's no question of fact here. But we know it was said, and a jury could find that he heard it. You took some discovery, correct? Only of Officer Rankin. And you had police reports as well? We do have the police reports. Which have statements on them as well? They have the very statement that we're relying on to say that he yelled less lethal, less lethal before the beanbags were shot. So yes, we do have some, but it's the intricacy of the timing. We named four witnesses that we wanted to talk to, and one of them was Rankin, but we weren't allowed to talk to the rest of them because there's no factual issue, according to the to the court. I have two minutes left, I'll reserve my time. I'll send you to rebuttal. Thank you, Your Honor. Good morning, I'm Nicholas Asato, and I'm arguing today on behalf of the Appalese. In Cruz v. City of Anaheim, this court said it would be unquestionably reasonable for a police officer to shoot a suspect if he reaches for his waistband or makes a similar Here, Mr. Longoria did both. He reached for his waistband, he sprung his arms up, chest high, arms extended, hands together, holding a black and white object, and pointed it directly at Deputy Rankin. You're characterizing what you saw in the video, correct? That's correct. You're describing what you saw, and then you're concluding that it was a shooter's stance. But isn't that ultimately a factual determination as to what that meant? That's the label, that is just a label, a shooter's stance or a shooting stance is just a label. But it carries significance because it suggests a conclusion that at that moment, Mr. Longoria presented a lethal threat to the officer. Isn't that what you're saying? No, what's significant here and what is the material point is simply the threatening gesture. And as Mr. Robbins just got up here and demonstrated himself, he admits that the video shows this much. At a minimum, and whether Mr. Longoria was intending to strike that pose or whatever reason from Deputy Rankin's perspective. How far was the officer away? 30 to 40 feet is what Deputy Rankin said. And I believe giving all reasonable. So for me to that line of people sitting behind you, I can see everything they're holding in their hands. This was not nighttime or anything else. I can see a pen, I can see a pen, I can see an empty hand. I don't have any trouble seeing whether, you know, just taking a stance like this with nothing in your hands wouldn't seem to justify shooting. Deputy Rankin didn't have the benefit of sitting behind the bench, staring at what was going on 30 feet in front of him. Deputy Rankin was in the throes of an extremely dangerous situation. Wasn't it, weren't the beanbags and the other things shot at him at that time? The beanbag rounds were deployed before that movement. If you watch the video closely, there were four shots and he reacted defensively. He was trying to get out of the way. Well, you would too, right? If people were shooting beanbags. It hurts. It hurts. And they were trying to use less lethal force. And there was somebody who said not lethal, non-lethal, right? So it was less lethal, less lethal. And on that point, if you listen to the video carefully, when you can hear him screaming, less lethal, less lethal, at that point, you can see Deputy Rankin in the background still running to his position. There's no way he could have heard that just like he testified that he didn't. But getting back to your point, Judge. Jury might believe it. Jury might think that's not true. I don't know. Let's assume he heard it. Less lethal. That all happened before the beanbag discharge rounds were even discharged. That happened before he was reacting. More importantly, that happened before, or let me put it this way, after he was hit with the beanbag rounds, at that point, he turned towards the car door and reached down and did this. That's all that matters. In that one second, in that one second before Deputy Rankin pulled that trigger, he made that furtive movement, that harrowing gesture, that threatening gesture. And whether you call it a smirk or he was just doing this. Threatening gesture or he was reacting to being hit by beanbag or by beanbags and whatever else they were hitting him with. I've got two answers for that. One, I disagree. If you look closely at the video. I didn't even hear a question. Why don't you let Judge Reinhardt finish the question? I apologize. Am I wrong that he could have been understood to be reacting to being hit by objects designed to bring him down? I don't think a reasonable jury viewing that video could reach that conclusion because there is a break and there's a distinction between him reacting defensively. And then him moving, making a move towards the vehicle and then him reaching down and up. That's point one. Point two, whether he was reacting, whether it was involuntary, which by the way, there's no evidence that this was an involuntary reaction. But let's say that it was, that he was just reacting and he didn't intend to do this. All that matters is what Deputy Rankin perceived that to be. That's all that matters. But what Deputy Rankin does not tell us he perceived was that there was a weapon. He said there was a stance. This is really the question. This is Arizona, middle of the day, perfect sunlight, and with an officer at 30 or 40 feet where it's perfectly obvious, you know, if anybody at 30 or 40 feet pulls a gun, I would think I'd see it. And I don't even have perfect vision. So the question is, can you start pulling the trigger under full visibility? I mean, night is different. You know, rain is different. Fog is different. But in full light, can you start pulling the trigger without actually seeing a weapon? The answer to that question is yes, Your Honor. A couple of recent cases. Well, okay, persuade me. I don't see it. Do you have a case? I've got a handful of cases. But let me just back up to the you're taking the view that this is a freeze frame, that he was just standing like that, and Deputy Rankin had an opportunity to make a decision and figure out what was in his hand. There's no dispute he had something in his hand. There's no dispute that it was black, partially black. This happened in three-tenths of a second. He went like this and turned in three-tenths of a second. Because he pulled the trigger. If he had waited a second more, too, it would have been longer than three-tenths of a second. The question is, can you, as an officer entitled, pull the trigger without actually identifying a weapon? And, you know, I mean, this has been going on for over an hour. And, I mean, I don't know all of our cases off the top of my head. But do we have any case saying you can use deadly force without identifying an actual instrument of deadly force? Actually, three cases in the last three years by this court in situations very similar to this. Corrales v. Impostado was a situation where there was a drug deal. An individual walked up to an undercover police officer's van, and he went like this, one foot away from the officer's face, turned around, and was shot. And five shots were fired in a span of 3.3 seconds. Didn't have a weapon, had his finger pointed like this, and it happened that fast. This court said that the force was reasonable. In Bowles v. City of Portersville, same situation. The suspect had a cologne bottle in his hand with a metallic top and took a shooter's stance. The court held that the officer reasonably believed that that posed a threat of harm. Even more recently, Arion v. City of Los Angeles, the suspect was holding a cell phone. Same situation, shooter's stance. Turned around to the officer, shooter's stance, and he was shot. In all three of those cases, this court held that the use of force was reasonable. And what did the suspect here have in his hand? Rosary beads. Rosary beads. In those cases, are you saying the facts also included the person turning around and putting their hands up in surrender and then being shot? No, well, no. Another case, Hudspeth v. City of Shreveport, was a situation where he had a cell phone, took a shooter's stance, and then was ultimately shot in the back. It wasn't a hands-up situation. Well, this was a hands-up situation, and it all happened in just a matter of seconds or fractions of a second. And so isn't that part of why one might consider that a jury question as to whether or not the officer did have enough time, since only seconds were elapsing, to assess the situation before he fired because it was only a fraction of a second before the person surrendered and put his hands up, signaling the officer that there was no threat? Well, one view is that he was putting his hands up in surrender. But recall, this is after 70 minutes of him telling police that he had a gun, that he was not going to stop, and that they would have to end the threat. So one may call it a surrender. Someone else may consider that he was perfecting suicide by cop. But what matters is that the moment that Deputy Rankin saw this, that justified his use of lethal force. But the shot came after Mr. Longoria had placed his hands in the air, correct? It's difficult to say when precisely the bullet struck him in the back. There's no dispute that the bullet struck him in the back. Well, he's standing there, and then is shot, according to the video. I don't think it happens that slowly. It happens in an instant. There's enough time for him to stand with his hands up before he falls down, right? And the evidence is it only takes three-tenths of a second. Three-tenths of a second going from a shooting stance to turning around. That's a split second. And under Graham, that's the amount of time that we're supposed to afford officers when analyzing use of force. We're talking about split seconds. And it took Deputy Rankin a second to perceive, process, and react. And it only took three-tenths of a second for Longoria to turn around. I mean, we're talking that fast. And under those circumstances, again, under Tennessee versus Garner, he only had to have probable cause. Deputy Rankin only needed probable cause that there was a threat of harm. This movement, for whatever reason he was doing it, that was enough to justify his use of force. Maybe I don't see it clearly, and that's quite possible. I looked many times at that video, and I must say I didn't find a shooting stance. This is all premised on the fact that that momentary gesture was a shooting stance. Do you think it's not possible that a jury could conclude that that was not a shooting stance? I don't believe so. And we don't have to call it a shooting stance. As long as it's a threatening gesture, it was perceived as a threatening gesture. It was perceived. I really didn't see any threatening gesture. Maybe I would not be a good juror. And I did look at it quite a few times. I must say it just looked to me like somebody was shot. He was reacting, jerking around, and then put his hands up and got shot in the back. Well, I think if you go back and look at our non-electronic exhibit number three, which is the enhanced iPhone video, it's actually more appropriately referred to as a stabilized iPhone, so it takes out the joggling, and you can see it without any movement. If you watch that video, trust your eyes. I did. I did. You're not in good shape. That's what I'm trusting with my eyes. And what Judge Bolton saw below and what plaintiffs have admitted in their briefs. They say in their opening brief at page 31, he raises his hands above his waist towards his chest. In his reply brief, they say he was putting his hands somewhere in front of himself. But isn't the point, I think, if I may, that Judge Reinhart is making to some degree is how fast this was happening, and that's why part of much of this, all of this perhaps, is a factual question as to whether or not, in light of how fast it was happening, it was reasonable to perceive a threat or it was not reasonable to perceive a threat, and whether it was reasonable to think that there was a time to pause and wait until it was clear the person had surrendered, or whether it was not reasonable. I mean, isn't that what we're dealing with here is a fast-moving situation that we do have some video evidence of that is very hard to assess as a factual matter. Because it's a fast-moving situation, that is why we have to give deference in these situations, not to decide whether there was enough time. An officer doesn't have to wait to confirm whether he's in fact holding a gun. That would be dangerous. That's a game of chicken. If that were what this court were to hold, you'd be telling officers that you've got to play this game of chicken and guess whether or not in that split second he's holding a weapon or not. But they don't need to confirm that. There just has to be probable cause. And that's what we're looking at. In the cases that I cited, Daig versus Damasek, Corrales versus Impostato, Arion, all of those, this is the exact same situation. It all happened in a matter of seconds. This actually happened in a fewer amount of time, in less than a second. Corrales occurred over 3.3 seconds. And yes, the fatal shot struck him in the back. But if you go back and look at the video, something else that you pointed out earlier, Judge, was the other two officers in the same area ducked. And if the standard here is what a reasonable officer perceived that as being a threat. Yes, but let me also point out the other officers didn't shoot either, and they were closer. They could see what he was doing, and they didn't shoot. Shouldn't we take that into account? Shouldn't a jury have an opportunity to take that into account? Well, I think Deputy Rankin kept his cool and kept his shot and kept his line and did the right thing in this case. I can't speak for the other officers. I don't even know who those other officers are. But from Deputy Rankin, and just because they didn't pull the trigger doesn't necessarily mean that there wasn't probable cause that he posed a serious risk of harm. Everyone had a different perspective. Officers lined straight up. There were officers that said that he made that movement towards the car and reached down. So it's not just the video. The other officers have corroborated this threat. And at a minimum, I'm almost out of time, but at a minimum, if you look at cases like SB v. County of San Diego and CB v. City of Anaheim, where they said that, okay, maybe there's issues of fact on whether or not the risk of harm was there. Was the movement threatening enough? In both of those recent cases, as two in the last year, this court afforded qualified immunity to the officers because under those precise circumstances, they gave them the benefit of the doubt. And this court should, at a minimum, give Deputy Rankin the benefit of the doubt because in these circumstances, it was even quicker and under more tense, rapidly evolving circumstances. That's what a minimum. Thank you very much. Thank you. This court has the luxury that we haven't had until recently of being able to have a video to look at. And when you look at Exhibit 15 to the Defendant's Index of Exhibits, it is the enhanced video that they talk about. And there is a tenth of a second where, whether they're together because of the perspective of the iPhone 200 feet down the road, there are hands up a tenth of a second. And then they start to go down at nine-tenths of a second. And then he turns and his hands are up when he's shot. But not in the Defendant's video. Because they understand what they have to do to really make this case. It's not have an instant, like if you catch something, freeze frame, ah, there's the one that we can use. You have to take the whole thing. And that's why in their video, when they turn it into slow motion, at one, it stays like this. You can see that the hands from the side in profile are together. And it stays there for five seconds in slow motion. So it looks like he's standing there for a long period of time. Not just that tenth of a second that it takes in the actual video with the time running. They have to freeze frame it because they know what the problem is with this case. The guy's getting hit with bean bags. He's flopping all over the place. But for 70 minutes they've followed him. He's never fired. And he's made it clear that he wants to pretend like he's got a gun, but he doesn't have one. He might have wanted to have had something that looked like a gun, but his actions don't bespeak someone who is trying to injure people on purpose and they don't justify the shooting in this case. One of the officers actually yells, he doesn't have anything. And at that level, when you're dealing with those facts over a 70-minute period of time. When are you saying that occurred, that he said he didn't have anything? It was before the shooting, but it's still in that general time period. But what you're dealing with here is where he can see what's going on in front of him. It isn't dark. It isn't quick. He's standing there getting fired at, but there's no indication. I mean, the defense counsel makes this motion. You can see the video for yourself. It doesn't support the decision that was made, and you shouldn't ever, when they say, hands up, don't shoot, out on the street, it's for a reason. Thank you, Your Honor. Thank you, counsel. Thank you both. The case, it's argued, will be submitted.
judges: Reinhardt, Kozinski, Berg